The next case is number 13-1470, Puchang Talent Diamond Tools v. United States. Mr. Hukom, is that right? It's pronounced Hukom, H-O-U-K-O-M. Okay. And I understand there was some misunderstanding with my appearance here today and I apologize for that oversight. Good morning. May it please the Court, I represent Appellant Puchang Talent Diamond Tools, Company Limited. The key point I intend to stress here today is that the goal of the anti-dumping process and the determination of margins is to find those margins as accurately as possible. It's a remedial, not a punitive procedure and because of mistake by our client in a supplemental response... When you say a mistake, do you mean that it's statement that the blades were produced by another company was incorrect? Yes, Your Honor. Is there any evidence in the record that shows that it was actually incorrect? When they were initially imported into the initial import records do indicate the origin and the producer as being Puchang Talent, which is an accurate statement when it was brought in. The only primary or documentary evidence, the mistake was their interpretation or their description of it after the fact when it was brought in to the United States and I believe... What in the record showed that they made a mistake? They wrote letters or submitted to Commerce saying, well, it was such a tiny thing that you should ignore it or you should take it in mitigation. They didn't say it was incorrect? They didn't determine that it was incorrect when they sent that initial letter. It's a small company. They misinterpreted. What they had were saw blade cores, which had been produced by an ineligible producer, which they had then altered substantively. They had tensored them. They had prepared them for the attachment of the teeth. In this instance, there was a single purchaser, one of their customers, who asked them to not complete the process of fully attaching those teeth to the blade itself. So it was essentially shifting parts, but it had been substantively altered from its original state. How was Commerce supposed to know that? As I understand the law, you may have an argument if there was a mistake that was evident from the record. Maybe. But if there was no mistake that was evident from the record, how could Commerce fail to do something which it was supposed to do? That's the basic dilemma here. And where in the record is your statement, what you're saying now, that they had an ineligible core and that they didn't attach to it and so on? Because I don't recall seeing that at all. Right, and that is the problem is that when they responded to the supplemental inquiries, they made the mistake then in describing it. So it's not in the record at all. It's not in the record until the determination to rescind was actually finalized and then they appealed the decision. It was with further investigation they were able to determine that they had misspoken. Essentially, they're caught on a point. Cite me to the appendix where it says that. I believe it's at C0346 in field 13 on that entry document. So it's in the confidential. What page again? I believe it's C0346. Would you like me to falsify that or should I proceed? Well. I don't want to speak on it. You can go ahead. So as I was saying, the issue here is that because they made the mistake right before the final rescission was issued, they essentially didn't have an opportunity to make a greater record. I've got it in front of me. Yes. Where does it say on this page that the parts weren't attached? It does not say that. What it says is that the producer of what was being imported was Poojang Talent. It doesn't say what they later interpreted that, oh, well, what we did was we imported these cores that were produced by someone else. Is that any of what you're telling us here in the record about the cores versus the attachments and the substantial chain? I apologize if that's what you thought I was saying. What I meant to say was that there was evidence that they had produced something. No, no, no. The question of that. Listen. Yes. The question, okay. The question is, is there anything in the record anywhere in these volumes that says, look, we imported these cores and we made a – that were ineligible. They were produced by an ineligible exporter, and we made a substantial change to them. Where is that in one of these volumes? No, I understand, John. No, it is not. As I was saying was that because they had made the mistake in how they described the thing. If they're not there, what you're telling us is not in the record, and as a result, it's simply a turning argument. How are we supposed to review that? I understand, Your Honor. And what I'm saying is that the only documentary evidence indicated not the more descriptive analysis of why – how those cores had been changed and why they were not – they would not render Poojang Talent ineligible. The only thing that was in the documentary evidence that was part of the record was that they were the producer of those goods. This is an agency. The agency has to be able to rely on the record presented to it, doesn't it? Yes, Your Honor. The reason we're here is – the reason Poojang Talent is seeking relief is because it's a small company that made a mistake, and that it's trying to – doing what it can to try and correct that mistake so it's not – does not suffer essentially a punitive effect of the determination of its import or its anti-dumping margins. The global anti-dumping margin that is going – or was applied to this category of goods is approximately eight times higher than – There was a means by which you could have submitted supplemental information or still can submit supplemental information to Congress, is there not? My understanding was that the proceeding before Congress was closed with the final rescission. With regard to that importation. Correct. But in the future, you can submit supplemental information. May you not? They – Because you're arguing that it will harm you in the future. Well, no. I'm arguing as to the injury that will occur to Poojang Talent based on the imports during the period of review. They have initiated a – the process to get their current anti-dumping rate set at the accurate level. Starting from April 2010 or something, which is the end of the period here, have you submitted a new shipper review? No, it's not a new shipper review. It's the annual review that's available to all importers. And you're seeking a separate rate in that? Yes, they are seeking a separate rate. So all we're dealing with here is from the period of review up until they initiated an annual review. The government argues the case is moot because all of these items have been liquidated. Are there any future consequences from the denial of the new shipper review that would carry over to items imported in the future? Until there is a determination on their new annual review, which has not yet been completed, the original – the country-wide rate will continue to apply to them. So there is – depending on how that annual review turns out, up until that date, there is additional injury that may occur. Also, there was a stay issued by the Court of International Trade. Well, I think in my question, I'm asking you to assume that the stay didn't affect the liquidation of these items, that the government's correct, that the items here were either actually liquidated or deemed liquidated, and that the case is moot as to those items. What I'm asking you is whether the denial of the new shipper review has any going forward consequences for new imports. And the answer is that until – and my understanding is that their annual review is undergoing now. So until the annual review is complete, if something were to go wrong with that – It affects the cash deposit rate or what? It does affect the cash deposit rate, and it also affects the determination of the final margin that they have to – the final rate that they have to pay until there is a final determination on their annual review, which would change their ground rules going forward, which has not occurred yet. So if we were to reach your questions that challenge the denial of the new shipper review, and if we were to agree with you and if that were to be reopened and you could get a different rate, that would actually have continuing consequences for something other than the items during this period. That is my understanding. Yes, Your Honor. On page one of its reply break, Poojang says, there is no dispute that the only contemporaneous evidence before the ITA demonstrated that the shipment consisted solely of Poojang Callan's goods. Isn't the questionnaire response contemporaneous evidence? Well, contemporaneous evidence I was referring to at the time of the import, not at the time of the decision. That was the intention of that word, is that at the time that the goods were entered into the United States. What proof do you have in the record? You keep referring to these questionnaire responses as clerical errors. What proof in the record is that they're a clerical error? Well, I think – Where's the definition for clerical error in the first place? I believe that was in the opening brief. Because my understanding of a clerical error is something other than a factual mistake, which is what you seem to be claiming. I understand, Your Honor. And what – let me find it. A clerical error would be if you put the wrong number. I understand in this – we believe that this is a clerical error because we attributed the single entry to the wrong producer. I understand – Based on a mistake of fact, you tell me. Yes, Your Honor. And I think it's also an issue that whether or not it is a clerical error. We also cited into – that it is according to, at least in the Timken case, that it's irrelevant whether the error in question is methodological, substantive, or errors of judgment rather than clerical error. So I understand, Your Honor, as an issue with calling it a clerical error versus an error of fact or an error of judgment. But I also submit that I don't think that that's necessarily dispositive on the issue. It's your argument. I understand, Your Honor. I'm going to save your rebuttal time here. Yes. Thank you. Is it Orlando Canizares? Yes. Good morning and may it please the Court. The notion that there has been some clerical error that – Before you go there, I'd like an answer to Judge Dyke's question about mootness. Were – was everything liquidated before Judge Eaton entered his stay? Yes, Your Honor. By virtue of the deemed liquidation statute, if not the liquidation – the actual liquidation of the entries. Under 1504D, there is a – Did the government raise that with the CIT? Did they alert the – No, Your Honor. And perhaps by proximity of time, the deemed liquidation issue did not come before the trial court. That is, the six-month period after which the entries were deemed liquidated was on August 15th, 2013. The judge's order was entered, I think it was on September 13th. And the deemed liquidation issue simply did not come up. But is Mr. Hookum correct that this has consequences for the future even apart from the liquidated items? Well, Your Honor, this really raises the question about the Zenith Rule. And the Zenith Rule – I understand. I know what the Zenith Rule is. But I don't know that any of our cases have addressed the question of whether something with future consequences becomes moot just because the particular items have been liquidated. Yes, Your Honor. The closest case that may even have any resemblance to the situation would be the Gerdau case, which involved a de minimis dumping margin. And the question was whether the case was moot by virtue of the liquidation of the entries in question, because after three findings of a de minimis dumping margin, it could result in the revocation of the anti-dumping order. But there is no real basis for extending those facts to this situation. But what if we say that it wasn't moot because of that? It wasn't moot because of that. But as to the entries in Gerdau, it was moot. And the rule in Zenith extends here – But this does affect his cash deposit rate for the future, doesn't it, the failure to get the New Shipper Review? No, Your Honor, because subsequent to the rescission of the New Shipper Review that Poojang sought, there was a first administrative review in which those very entries that were subject to the New Shipper Review were reviewed. Poojang did not contest and seek a separate rate as part of that proceeding. And it was – those final results were issued in early February of 2013, and that's what gave rise to the liquidation of the entries. So they had the opportunity to seek a relief. In addition, there's been, I believe, two other administrative reviews on the Diamond Sawblaze in which they would have had the opportunity to seek a separate rate. And they didn't seek a separate rate? Not to my knowledge, Your Honor, no. The SKF case is instructive on the issue of deemed liquidation. In that case – Which one? I'm sorry, Your Honor? You said which one. There's about a million. The one that we cite in our brief, which is from 2008. That was a court decision. In which the injunction was not entered until after the actual deemed liquidation. And the court recognized that there was simply no way to backdate that injunction. It was powerless to do that because it was inconsistent with the rule in SENA. Well, what I understand you to be saying is that because they could have sought a separate rate, that there are no future consequences to the New Shipper Review. Is that correct? Your Honor, the New Shipper – under the New Shipper Review statute and the regulations, the Commerce would be reviewing the entries within a limited period of time to determine the dumping margin as to those entries. There's no question that those entries, the entries that would be reviewed, have all been liquidated. But what is – I guess I'm confused. What's the difference between a New Shipper Review proceeding and a proceeding where they're seeking a separate rate? Is there a different burden? I mean, what are the advantages of the New Shipper Review? Well, the major advantage of the New Shipper Review is that if you can demonstrate that your entries were not reviewed previously and you were eligible for New Shipper Review, and that really is the question here is eligibility, one of the major advantages is that it's an expedited proceeding. It actually moves quite – much faster than an administrative review. And in addition to that, you as an exporter can have a bonding privilege where – which allows you to import merchandise during the pendency of the New Shipper Review at a much lower rate than the usual cash deposit rate. So it affects the cash deposit rate? During the pendency of the New Shipper Review, yes. Well, if he'd gotten a New Shipper Review, he would have had a lower cash deposit rate for the future with respect to other imports other than the ones that you say were liquidated, correct? If there were New Shipper – yes, Your Honor. I believe that's correct. So it seems to me it does have some future consequences. Your Honor, in answering that, bring in the annual reviews that went by as well. That's what bothers me. I didn't realize there had been three annual reviews. There have been annual reviews, and in addition to that, the cases are clear that there is really no exception to the Zenith Rule where a company fails to seek a preliminary injunction in a timely manner. That's really what the underlying problem is here is that Poojang had that opportunity, the obligation to seek that preliminary injunction at the outset of the litigation, and they didn't do it. If I may turn to the merits, the notion that there was a clerical error, that commerce failed to identify and failed to correct does not withstand scrutiny. You were directed to the single instance in the record that Poojang relies on, which is an entry form at C0346. And if you look at the field in that one document, there is a word under the word manufacturer ID that may be construed as a word that resembles Poojang's name. But of course, as the trial court noted, that was insufficient to put commerce on notice, that it was supposed to disregard all these other statements and find them to be inaccurate and rely on this one form. And to be clear, this was not one single quote-unquote mistake. These were multiple representations that Poojang made before commerce. On August 6, 2010, this is at A408 of the record, Poojang said that besides self-produced merchandise, Poojang, quote, also exported outsourced merchandise. On August 27, 2010, they said something very similar. That's at A1870 of the record. And perhaps most tellingly, even when Poojang was confronted with the prospect of the new ship of review being rescinded, they didn't disavow their earlier statements. They didn't seek to amend them. They never sought to correct them or modify them. What they did was they embraced them. And they said on January 10, 2011, that Poojang, quote, does not deny that in that, and they refer to this other company's merchandise, it exported certain subject merchandise produced by, and it refers to that other company. And these were in response to specific questions that commerce had posed for the purpose of identifying whether this company was eligible. And under the regulation that's at issue here, which is 19 CFR 351-214-B22B, if the company seeking the new ship of review did not produce the merchandise, it needs to provide a certification from the company that did. And that certification could not be, as the trial court noted, truthfully provided here on this record. With regard to substantial transformation, you heard some discussion about the products being altered, but also a concession that that information was not in the record. And as we have argued that there was a failure to exhaust administrative remedies with respect to that argument, which is sufficient to dispose of it. But in addition, the record evidence didn't indicate any additional manufacturing or an additional sort of processing. And the fact is that the anti-dumping order for diamond saw blades also applied to the parts of the diamond saw blades. And there is no dispute here that the parts of the diamond saw blades were subject merchandise. Let me ask you a procedural question. Supposing we agree with the Court of International Trade's decision, but we also agree with your analysis regarding liquidation. Is the government's position that we should then dismiss rather than affirm the Court of International Trade? No, Your Honor. The government's position would be that the judgment, that is the May 3rd judgment that is before you, should be affirmed. The question of the stay of the judgment was a separate order that was issued thereafter. Wait a second. I don't understand that. If the case is moot, shouldn't we dismiss it as moot as opposed to affirming it? Yes, Your Honor. And I should… Okay. Now I'm confused. Okay. Our initial position is that the case is moot and should be dismissed for that reason. That's what I asked, yeah. But in the event that the court disagrees with us on mootness… But I said supposing we accept your argument regarding liquidation and, as a result, mootness, but we agree with what the court below did, the government's position is we should dismiss it as moot rather than affirming it. Correct. Yes, Your Honor. Has Kuchang imported any other items subject to the anti-dumping duty after the liquidated items? I'm not aware of that, Your Honor. I would briefly address the issue of the equitable arguments that seem to be being made here. As the trial court pointed out, there is no exception in the regulation that allows commerce to disregard the certification requirement. There's no de minimis exception. There's no exception that could be made. But there are cases that suggest that if the record before commerce shows a clear error, that maybe you have an obligation to correct it. Your Honor, there certainly are cases that this court and the Court of International Trade involving errors, but none of those involve a situation such as we have here where the error is not identified during the administrative proceedings. And that really is… Identified or apparent. Identified or apparent. And for example, in the Fisher case, examining whether it was an abuse of discretion for commerce to reject an attempt to provide corrective information. But those aren't our facts. This is a circumstance where a domestic brought this to your attention. Is that right? Yes, Your Honor. The way this came about was that the domestic manufacturers… So then you turn around. ITA turns around and asks the exporter and gets an explanation. And that's what's in the record. Right. Exactly, Your Honor. There was a preliminary decision to rescind, at which point Poojang had the opportunity to file a case brief in which it made this argument, this equitable argument. And then there was the final decision to rescind thereafter. For these reasons, we respectfully request that the court dismiss the action as moot or, in the alternative, affirm the judgment of the trial court. Thank you, Mr. O'Loughlin. Mr. Huckam? Yes, Your Honor. Has your client imported any items subsequent to the items that the government says were liquidated? Yes, Your Honor. They have? They have. Are there any proceedings pending as to the appropriate anti-dumping duty with respect to those? I have not seen the paperwork, but it's my understanding that they're currently applied to participate in the annual review. Well, the government says… This is what bothers me. The government says that there have been, in fact, three annual reviews already. Is that correct? I believe the third one is ongoing now. Well, is the first one completed? Yes, the first two are completed, Your Honor. Okay. And under those first two, was there importation of goods? I'm not sure of the details of when. At some point during those first two, there was, but I can't say substantively whether it was in the first or the second. What was the determination by the ITA in relation to those first two years? Well, Boojang Talent did not participate in the annual reviews in the first two opportunities. My understanding is the first one took place before the new shipper review issues had been resolved, so they were in the process of the new ship review. They then missed the deadline to participate in the second annual review, and they are now participating in the third annual review. That's my understanding, Your Honor. Are you saying they didn't ask for a separate rate in the two reviews because they were still litigating the new shipper review issue? They were still litigating the new shipper review issue in the first annual when they would have sought a separate rate in the first. This case has been ongoing in the appeals when the second annual review occurred, but I don't know if I could say that they were still, I mean, to a degree that's still litigating the new shipper review, but that the final rescission had already taken place before the second annual review, and their opportunity to participate in that occurred, and they failed to do so. One issue that was, or one thing that was recently brought, let me just address the issue of mootness, and I think that until there is a determination in this annual review they're participating in now, there would be, and there will be an effect of the determination to rescind their new shipper review ongoing, so we would submit that the matter is not moot. Unless there's anything else, we would submit, Your Honor. Okay, thank you. Thank both counsel. The case is submitted, and that concludes our session for today.